IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL JAMES GLYNN, ) <br> ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> NANCY A. BERRYHILL, Acting ) <br> Commissioner of Social Security, ) <br> ) <br> **Defendant.** ) | No. 17 C 4312 <br><br> Magistrate Judge Sidney I. Schenkier |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Michael Glynn has filed a motion seeking reversal and remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") (doc. # 12: Pl.'s Mot. For Summ. J.). The Appeals Council denied his request for review of that decision, making the ALJ's decision the final decision of the Commissioner (R. 1). *See* 20 C.F.R. § 404.981. The Commissioner has filed a cross-motion asking the Court to affirm the ALJ's decision (doc: # 21, Ex. 1: Def.'s Mot. For Summ. J.). For the reasons that follow, we grant Mr. Glynn's motion to remand and deny the Commissioner's motion to affirm.

### I.

Mr. Glynn worked heavy duty as a spice mixer/operator for fifteen years at Kraft Foods until his alleged disability onset date of November 25, 2012, at age 45 (R. 208, 596). On November 27, 2012, Mr. Glynn visited his primary care physician, James Bull, M.D., with complaints of left

---

[1]On August 8, 2017, by consent of the parties and pursuant to 28 U.S.C. §636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 8).

neck pain that radiated to his upper left arm (R. 414). Mr. Glynn had diminished range of motion and moderate pain and tenderness in his left upper extremity and cervical (upper back/neck) and thoracic (mid-back) spine (R. 416). Dr. Bull prescribed Flexeril (a muscle relaxant) for spasms and etodolac (a nonsteroidal anti-inflammatory drug or "NSAID") for pain (R. 414). On November 30, 2017, Dr. Bull added a prescription for methocarbamol (a muscle relaxant to treat spasms and pain) because Mr. Glynn reported no alleviation of his pain (R. 411). On December 7, 2012, Dr. Bull added a prescription for Vicodin because Mr. Glynn continued to complain of "aching, sharp, and spasmodic" neck pain (R. 408-10). Mr. Glynn returned to Dr. Bull four times over the next two months with similar symptoms; on February 8, 2013, Dr. Bull opined that Mr. Glynn could not work due to severe pain and tenderness in his neck and shoulders and reduced strength in his arm (R. 616-17).

On December 13, 2012, Mr. Glynn visited an orthopedic specialist, Waqas Hussain, M.D., to address his shoulder and left side pain and weakness (R. 457). Dr. Hussain found Mr. Glynn had limited cervical range of motion and was positive for weakness and pain, but imaging of his shoulder and spine did not show evidence of fracture or arthritis, and Dr. Hussain opined Mr. Glynn's symptoms were "well out of proportion" to his "radiographic markers" (R. 457-58). On December 27, 2012, Mr. Glynn stated that his pain had lessened, but physical examination continued to show some weakness, tenderness and limited range of motion (R. 456). Dr. Hussain opined Mr. Glynn could return to work on light duty or a desk job (R. 462). On February 7, 2013, Dr. Hussain noted that Mr. Glynn appeared to be "doing well" (R. 297), and he opined that Mr. Glynn could return to work with no restrictions (R. 461).

From December 2012 through February 2013 (and once in April 2013), Mr. Glynn also received physical therapy to treat spasms and severe pain in his shoulders and upper back (R. 308).

Mr. Glynn's pain seemed to lessen over time, but at the end of this treatment, he reported that his pain was still at a seven out of ten and he was "about 30% spasmic" (R. 348-49).

On February 1, 2013, Mr. Glynn began treatment with Joseph Brooks, D.O., a physiatrist (a physician specializing in physical medicine and rehabilitation), for his neck and shoulder pain (R. 583). Dr. Brooks attempted osteopathic manipulation (applying light pressure, resistance, and stretching), but it was not helping after three attempts (R. 568).

On April 26, 2013, Mr. Glynn visited Matthew Biggerstaff, D.O., at a pain management center for treatment of his "left-side body pain" (R. 362). Palpation of Mr. Glynn's spine showed "diffuse tenderness throughout the left side," and he had some increased pain when moving his head (R. 363). Based on Mr. Glynn's MRI -- which showed only a small broad-based disk bulge in the cervical spine -- Dr. Biggerstaff opined that his pain was myofascial (chronic, muscular) rather than radicular (relating to the spinal nerves) (*Id.*). Dr. Biggerstaff started Mr. Glynn on tizanidine (a muscle relaxant), and he recommended Mr. Glynn continue osteopathic manipulation and consider starting on Cymbalta (a nerve pain medication and antidepressant) or another antidepressant (R. 362-63). On May 24, 2013, Dr. Biggerstaff wrote that he "[had] little to offer [Mr. Glynn] other than the tizanidine," though Mr. Glynn felt it was beneficial (R. 357).

On September 5, 2013, Dr. Brooks noted that in addition to neck and back pain, Mr. Glynn had numbness and tingling on the left side of his face and vague sensory changes on the left side of his body (R. 499). Dr. Brooks ordered an MRI of Mr. Glynn's brain; the MRI came back normal, but a Magnetic Resonance Cerebral Angiography ("MRA") appeared to show a small aneurysm (R. 523). Follow-up imaging showed a "slight vascular fullness" which indicated either a "very small" aneurysm or a "small vascular loop or fenestration" (R. 473).

On October 10, 2013, Mr. Glynn had a neurology consultation with Daniel Johnson, M.D. (R. 523). Mr. Glynn reported left side numbness and spasms along his entire spine (*Id.*). Dr. Johnson's examination found no evidence of muscle spasm and normal sensation with "clear break-away weakness on both the left and right sides with very little effort on strength testing" (R. 523-24). Dr. Johnson opined that Mr. Glynn's symptoms were "nonphysiologic" and might have "some type of a depression or emotional basis" (*Id.*). Dr. Johnson recommended psychiatry, but Mr. Glynn "was not in agreement" (*Id.*).

On November 20, 2013, William Lopez, M.D., conducted an internal medicine examination for the Bureau of Disability Determination Services ("DDS"). Mr. Glynn reported muscle spasms and pain in his neck and back at a level of ten out of ten, but Dr. Lopez wrote that he seemed "poorly reliable" (R. 443). Physical examination showed full strength and normal range of motion, except for limitation in the cervical spine (R. 445-46). On December 12, 2013, a State agency physician opined that Mr. Glynn had the severe impairment of degenerative disc disease, but that he retained the residual functional capacity ("RFC") to perform light work with occasional limitations in climbing ladders, ropes, and scaffolds (R. 84-87).

In December 2013, Mr. Glynn began visiting Darcy Anderson, P.A., on a monthly to bimonthly basis. Ms. Anderson repeatedly noted that Mr. Glynn had limited range of motion in his neck and pain and tenderness upon motion throughout his shoulders, back and legs (R. 652). Over the course of her treatment, Ms. Anderson opined that Mr. Glynn had arthralgia (joint pain), fibromyalgia, osteoarthritis, degenerative disc disease, and depression (R. 648). She prescribed Cymbalta for pain and depression, but Mr. Glynn declined a referral to a psychiatrist (R. 648-49, 653). In March 2014, Mr. Glynn reported an onset of left elbow pain and left side spasms; Ms. Anderson prescribed a muscle relaxant and asked him to return to physical therapy, but Mr. Glynn

declined because he was worried about additional pain (R. 710-11). In June 2014, Ms. Anderson added prescriptions for sedatives because Cymbalta negatively affected Mr. Glynn's sleep (R. 707-08). In October 2014, Mr. Glynn reported he was "completing his own 'therapy' and [] 'pushing himself to break the cycle'" with exercise and yard work, but he awoke with spasms in his left shoulder (R. 701). In April 2015, Mr. Glynn reported recurrent muscle spasms in his spine, and Ms. Anderson prescribed Flexeril, Cymbalta and Mobic (an NSAID used to treat osteoarthritis and rheumatoid arthritis) (R. 726).

Alyssa Wislander, Advanced Practice Nurse ("APN"), took over Dr. Bull's practice in 2014, and began treating Mr. Glynn for various diagnoses associated with chronic pain as early as April 2014 (R. 672, 700). On April 9, 2015, Mr. Glynn reported having chronic pain and numbness down his entire left side (R. 732). Ms. Wislander's examination showed tenderness down his left side and decreased arm strength (R. 734). She saw Mr. Glynn again in October 2015 (R. 735), and on March 3, 2016, after an examination, she completed a "Summary Impairment Questionnaire," opining Mr. Glynn could sit, stand or walk less than one hour a day and rarely or never lift or carry five pounds (R. 755).

On November 7, 2014, Charles Carlton, M.D., conducted an internal medicine examination for DDS. Dr. Carlton noted that Mr. Glynn reported significant pain throughout his spine and shoulders and multiple tender points in a pattern consistent with a chronic pain syndrome such as fibromyalgia (R. 718). However, examination revealed "full painless range of motion in all joints" except the shoulders, though Dr. Carlton noted Mr. Glynn displayed "limited and inconsistent effort" during range of motion and muscle strength testing (R. 718-19). On December 23, 2014, a State agency physician opined Mr. Glynn had severe degenerative disc disease but retained an RFC to perform light work with some limitations in climbing ladders, ropes, and scaffolds (R. 98-

5

101). On December 16, 2014, State agency psychologist, Russell Taylor, Ph.D., opined Mr. Glynn did not have a severe mental impairment, but that he had anxiety-related disorders that would cause mild restrictions in activities of daily living ("ADLs"), mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence or pace (R. 98).

## II.

To get to his hearing on March 9, 2016. Mr. Glynn drove an hour and a half with one stop along the way (R. 44). He was unable to raise his right hand to be sworn in because, as he put it, his "right shoulder's gone" (R. 40), though his left side is more painful (R. 68). Mr. Glynn testified that his medications provide temporary pain relief (R. 49), but caused him nausea, gastrointestinal issues, drowsiness, memory loss, numbness, depression, and anxiety (R. 50). Mr. Glynn cared for his personal hygiene but washing himself irritated his shoulder (R. 64). He testified that all physical activity worsened his pain; he could not walk far or stand or sit for more than 5 to 15 minutes at a time due to pain (R. 65-67). Mr. Glynn also had trouble gripping things in his left hand (R. 68-69).

The ALJ presented the vocational expert ("VE") with hypothetical individuals who could perform medium or light work with additional postural limitations (R. 74-77). The VE testified that significant numbers of such jobs were available (*Id.*). However, if the individual was limited to light work and occasional handling, fingering, and reaching with the left non-dominant hand, the individual's productivity would fall below acceptable levels of performance (R. 78).

## III.

On May 12, 2016, the ALJ issued a written decision finding Mr. Glynn was not disabled from his alleged onset date through the date of the opinion (R. 21). The ALJ determined Mr. Glynn had the severe impairment of degenerative disc disease, but that his fibromyalgia and depression were not severe (R. 23). The ALJ noted that a tender points test was not performed to determine

fibromyalgia, but the "diagnosis seems to have mostly been an attempt to explain the claimant's odd left sided body pain," and it "does not explain the claimant's unique symptomology" (R. 23-24). Regarding his depression, the ALJ found Mr. Glynn had: (a) no limitation in ADLs because he reported being "independent in his personal needs," and "he does not perform chores, but only due to pain;" (b) no limitation in social functioning because he had no trouble getting along with family and friends; and (c) mild limitations in concentration, persistence, or pace because he completed high school and some college. and medical records "overwhelmingly" described his psychological functioning as "normal" (R. 24-25). The ALJ determined that these impairments, alone or in combination, did not meet or equal a Listing and that Mr. Glynn had the RFC to perform medium work, except he was limited to occasional climbing of ropes or scaffolds (R. 25-26).

The ALJ found Mr. Glynn's statements concerning the intensity, persistence, and limiting effects of his symptoms not "entirely consistent" with the medical evidence (R. 26). The ALJ noted that Mr. Glynn testified he could not sit for more than 10 or 15 minutes, but he drove ninety minutes to the hearing (*Id.*). In addition, imaging revealed "minimal degenerative changes" and a "small area" of disc protrusion, and Mr. Glynn's clinical signs and reports of pain improved with physical therapy (R. 27). Furthermore, the ALJ stated that Dr. Hussain, an orthopedist, could not identify any structural causes for Mr. Glynn's symptoms, and Dr. Hussain indicated in February 2013 that Mr. Glynn was doing well and significantly improved with treatment (*Id.*). While Mr. Glynn was in "moderate distress on at least one occasion," the ALJ stated that the "vast majority of the record" showed he was "not in acute distress or [wa]s in only mild distress" (R. 27). In addition, during examinations where Mr. Glynn had less than full muscle strength, records showed he "put forth a poor effort" (*Id.*). Based on these examples and the ALJ's observation of Mr.

Glynn's demeanor at the hearing, the ALJ found Mr. Glynn's subjective statements "unpersuasive" and gave them "little weight" (R. 28).

The ALJ gave "some weight" to the opinions of the State agency medical consultants because their opinions limiting Mr. Glynn to light work were "consistent with the medical record, which indicates the claimant has complained of back pain, but his diagnostic images suggest only mild impairment" (R. 28). However, the ALJ limited Mr. Glynn to medium work "based on a combination of the aforementioned minor diagnostic images and the claimant's presentation and testimony during the hearing" (*Id.*). The ALJ also found the State agency psychological consultant's opinion was "consistent with the record," but the ALJ differed "slightly" with the State agency opinion, finding Mr. Glynn "does not even have mild limitations in activities of daily living or social functioning," based on his function report and hearing testimony (R. 29).[2]

The ALJ gave "very little weight" to Ms. Wislander's "Medical Source Statement" (Summary Impairment Questionnaire) because "the claimant brought the provider this form, was present while the provider completed the form, was asked questions off of the form, and the provider wrote down the claimant's answers" (R. 28). The ALJ stated generally that he gave "little weight to any opinion (medical or otherwise) which [wa]s based solely or primarily on the subjective statements of the claimant" (*Id.*). The ALJ also found Ms. Wislander's opinion that Mr. Glynn could not sit for even an hour during an eight-hour workday to be inconsistent with the fact that he drove ninety minutes to the hearing, sat for one hour and nineteen minutes at the hearing with no signs of distress, and presumably drove ninety minutes back home (R. 28-29).

---

[2] The ALJ stated that he "agrees" with the State agency psychologist "that the claimant does have a mental impairment that more than minimally limits him" (R. 29). This appears to be a typographical error because both the State agency psychologist and the ALJ found Mr. Glynn's mental impairment was not severe, meaning that it did not more than minimally limit him.

The ALJ did not mention Mr. Glynn's other treatment providers, but the ALJ "noted" generally that there were "statements in the claimant's record indicating that the claimant is unable to work" (R. 29, citing Exhibits 3F, 2F and 15F). The ALJ gave "little weight" to those statements because "th[o]se notations seem to be transcribing the claimant's reports or an attempt to describe the claimant's employment status, not opinions from medical experts indicating that in their expert opinion the claimant is medically unable to work" (R. 29). Ultimately, the ALJ concluded that Mr. Glynn could not perform his past work, but that other jobs existed in significant numbers that he could perform (R. 29-30).

V.

We review the ALJ's decision deferentially to determine if it was supported by "substantial evidence," which the Seventh Circuit has defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ghiselli v. Colvin*, 837 F.3d 771, 776 (7th Cir. 2016). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Mr. Glynn argues that reversal and remand is warranted for several reasons. We agree that remand is necessary for at least two of these reasons: the ALJ failed to adequately assess the opinion evidence of Mr. Glynn's medical treatment providers, and the ALJ's determination that Mr. Glynn could perform medium work was not supported by substantial evidence (doc. # 13: Pl.'s Mem. in Supp. of Summ. J. at 7-8).

## A.

Mr. Glynn contends that "[e]ssentially, the ALJ cherry-picked his way through the medical evidence . . . to present a skewed version of his true condition" (Pl.'s Mem. at 14). We agree. Although an ALJ is not required to "mention every snippet of evidence in the record," an ALJ "may not ignore entire lines of contrary evidence," *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), and "[a]n ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence," *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016). This type of "cherry-picking" is improper. *Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016). Here, the ALJ's selective parsing of the record requires remand.

*First*, the ALJ failed to mention Mr. Glynn's first treating physician, Dr. Bull, whom Mr. Glynn visited more than ten times from 2012 through 2014. Two hundred pages of Dr. Bull's medical records are contained in Exhibits 3F and 15F, which exhibits the ALJ wholly rejected for "transcribing" Mr. Glynn's reports rather than providing expert opinion (R. 29). However, these records show that not only did Mr. Glynn repeatedly complained of moderate pain and tenderness on the left side of his body, but Dr. Bull attempted to treat Mr. Glynn's pain with referrals to specialists and prescriptions for multiple pain medications, including muscle relaxants, NSAIDs, and Vicodin. In addition, while the ALJ relied on Dr. Hussain's determination on February 7, 2013 that Mr. Glynn was "doing well," he ignored Dr. Bull's certification the next day that Mr. Glynn could not work due to severe pain and tenderness in his neck and shoulders and reduced arm strength. This "inadequate evaluation of a treating physician's opinion requires remand." *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017).

*Second*, the ALJ improperly ignored the treatment Mr. Glynn received from Ms. Wislander, who took over Dr. Bull's practice in 2014. Although the ALJ specifically discounted

Ms. Wislander's March 2016 opinion, the ALJ ignored that by then, Ms. Wislander had been Mr. Glynn's primary care provider for nearly two years. Opinions from nurse practitioners, "who are not technically deemed 'acceptable medical sources' under [the] rules, are important and should be evaluated on key issues such as impairment severity and functional effects . . ." SSR 06-03P, 2006 WL 2329939, at *3 (Aug. 9, 2006). *See also Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) ("ALJs must consider psychologists' and nurse practitioners' opinions on the severity of a patient's impairments"). The ALJ's failure to acknowledge the ongoing treatment Ms. Wislander provided to Mr. Glynn constituted improper cherry picking that requires remand.

*Third*, the ALJ ignored multiple other medical providers who provided treatment to Mr. Glynn. After Mr. Glynn stopped seeing Dr. Hussain in the spring of 2013, Mr. Glynn continued to seek treatment from other types of doctors and specialists for pain in his left side, including: (1) Dr. Brooks, a physiatrist who treated Mr. Glynn with osteopathic manipulation; (2) Dr. Biggerstaff, a pain management specialist who prescribed Mr. Glynn with various medications; and (3) Ms. Anderson, a physician's assistant specializing in rheumatology, who prescribed Mr. Glynn with Cymbalta, muscle relaxants, and NSAIDs to treat his pain and recurrent muscle spasms in his spine. Some of Dr. Brooks's and Dr. Biggerstaff's medical treatment records were included in Exhibits 3F or 15F, which the ALJ wholly rejected with little explanation. The ALJ cites to a few of Ms. Anderson's medical records, but these citations epitomize the forbidden use of cherry-picking, as the ALJ parsed out notes in Ms. Anderson's treatment records to support his conclusion that Mr. Glynn was not in acute distress and had no muscle atrophy (*see, e.g.*, R. 27-28, citing

Exhibits 27F/3 and 19F/7, 10, 13).³ The ALJ's decision to ignore these entire lines of evidence requires remand.⁴

**B.**

Mr. Glynn also contends that the ALJ's determination that he could perform medium work was "an illogical and inexplicable leap" from the "[t]he ALJ's assessment of various medical opinions," and "appears to be based largely upon the ALJ's own lay assessments of Plaintiff's impairments" (Pl.'s Mem. at 14-15). We agree.

As explained above, the ALJ ignored or gave little weight to the opinions of Mr. Glynn's medical treatment providers. In addition, although the ALJ stated that he gave some weight to the opinions of the State agency medical consultants, the ALJ ultimately came to different conclusions than they did. The ALJ stated that the opinions of the State agency medical consultants finding Mr. Glynn could do light work were consistent with the record, and specifically that diagnostic

---

³Ms. Anderson appears to be the first medical provider to opine that Mr. Glynn's symptoms were consistent with fibromyalgia. Although we do not address in this opinion Mr. Glynn's contention that the ALJ erred in determining his fibromyalgia was not severe, we are concerned that the ALJ misunderstands the nature of fibromyalgia pain, which is not visible on radiographic imaging or other objective tests. *See Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) ("we are troubled by the ALJ's purported use of objective medical evidence to discredit [the claimant's] complaints of disabling pain because fibromyalgia cannot be evaluated or ruled out by using objective tests"). On remand, the ALJ should more carefully explain his reasoning on this impairment. In addition, on remand the ALJ must not ignore treatment by physician assistants because they, like nurse practitioners, are important for evaluating "key issues such as impairment severity and functional effects." SSR 06-03P, 2006 WL 2329939, at *3. "With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* Indeed, for disability claims made after March 27, 2017, "the final rules state that all medical sources, not just acceptable medical sources, can make evidence that we categorize and consider as medical opinions." *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 82 Fed. Reg. 15263 (Mar. 27, 2017).

⁴We further caution the ALJ that his decision to "give[] little weight to any opinion (medical or otherwise) which is based solely or primarily on the subjective statements of the claimant" is not a sufficient nor adequate basis on which to simply disregard reports in the record (*see* R. 28). The ALJ may not reject opinions wholesale without specifying which opinions he found were based entirely on noncredible reports from the claimant, and why he reached that conclusion. Blanket conclusions and bulk citations to the record fail to build "a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore*, 743 F.3d at 1121.

images suggested only mild impairment, but nevertheless assigned him an RFC to perform medium work, based on Mr. Glynn's "presentation and testimony during the hearing" (R. 28).

The Commissioner is correct that "the final responsibility for deciding the RFC is reserved to the Commissioner" (doc. # 21, Ex. 2: Gov.'s Br. at 14-15). That said, "ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves." *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014). Mr. Glynn's "presentation and testimony" at the hearing does not change the fact that the ALJ's conclusion that Mr. Glynn could perform medium work was not supported by *medical* evidence in the record. Thus, the ALJ's conclusion "amounts to the ALJ improperly 'playing doctor.'" *Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).

## CONCLUSION

For the reasons stated above, we grant Mr. Glynn's motion to remand (doc # 12) and deny the Commissioner's motion to affirm (doc # 21, Ex. 1). The case is remanded for further proceedings consistent with this opinion. We express no view on the result of those proceedings. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATED: August 9, 2018